United States District Court
Middle District of Florida
Jacksonville Division

**PAMELA EMINISOR,**

    *Plaintiff,*

v.                                                        **NO. 3:19-cv-974-J-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

___

# Order

    Pamela Eminisor brings this action under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying her application for benefits. Doc. 1. A vocational expert testified there had been 87,000 unskilled jobs nationally someone with Eminisor's characteristics could have performed in 2008. Eminisor raises one issue: whether that testimony is reliable.

## Background

    Summaries of the law and the administrative record are in the ALJ's decision, Tr. 631–45, and the parties' briefs, Docs. 15, 18, 24, and not fully repeated here.

    This is the third time Eminisor has sued for review of a decision by the Commissioner. *See* 3:11-cv-570-J-JRK; 3:13-cv-948-J-MCR; *see also* Doc. 15 at 1–2 (current brief describing procedural history).

    The decision now under review is a decision by an Administrative Law Judge ("ALJ") dated May 9, 2018. Tr. 628–55. The period at issue is August 8, 2003 (the alleged onset date) to December 31, 2008 (the date last insured). Tr. 133, 151.

## Standard

A court's review of an ALJ's decision is limited to whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoted authority omitted). The threshold—"more-than-a-mere-scintilla"—is "not high." *Id.* at 1154, 1157.

## Law

To decide whether a claimant is disabled, the Social Security Administration ("SSA") uses a five-step sequential process. 20 C.F.R. § 404.1520(a)(4). At step five, the SSA considers the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v).

That other work "must exist in significant numbers in the national economy" considering where the claimant lives or "several regions in the country." *Id.* §§ 404.1560(c)(1); 404.1566(a). "Isolated jobs" in "very limited numbers in relatively few locations" outside the claimant's region are not considered work in the national economy. *Id.* § 404.1566(b). No threshold for "significance" exists. The Eleventh Circuit has upheld a finding that 23,800 jobs nationally is significant. *Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 935 (11th Cir. 2015).

The SSA is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). To satisfy that responsibility, the SSA "does not tally the number of job openings at a given time, but rather approximates the number of positions that exist[.]" *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoted authority omitted).

2

To determine that unskilled sedentary, light, and medium jobs exist in the national economy, the SSA takes "administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). "For example," the SSA "will take notice of" the Dictionary of Occupational Titles ("DOT") published by the Department of Labor, County Business Patterns and Census Reports published by the Bureau of the Census, Occupational Analyses prepared for the SSA by state employment agencies, and the Occupational Outlook Handbook published by the Bureau of Labor Statistics. *Id.* § 404.1566(d)(1)–(5). To decide a complex issue, the SSA also may use a vocational expert. *Id.* § 404.1566(e).

The DOT "remains one of the vocational expert's primary tools." *Goode*, 966 F.3d at 1281. The DOT groups jobs into occupations based on similarities and assigns each occupation a code. *Id.* The DOT provides no information about the number of jobs in the national economy. *Id.* For that information, a vocational expert must use another source, like the Occupational Employment Quarterly. *Id.* That source groups jobs using the Standard Occupational Classification ("SOC") system, not DOT codes. *Id.* As a result of that grouping method, one SOC group can include many DOT occupations.[1] *Id.* Accordingly, after determining the number of jobs in an SOC group, a vocational expert must "take an additional step to approximate how many of those are the specific job or jobs that the claimant could perform." *Id.* at 1283. "In other words, the vocational expert must use some method for associating the SOC-based employment numbers to DOT-based job types." *Id.* (internal quotation mark and

---

[1] The [SOC] system is a federal statistical standard used by federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 867 detailed occupations according to their occupational definition. To facilitate classification, detailed occupations are combined to form 459 broad occupations, 98 minor groups, and 23 major groups. Detailed occupations in the SOC with similar job duties, and in some cases skills, education, and/or training, are grouped together.

*Standard Occupational Classification*, U.S. Bureau of Labor Statistics, https://www.bls.gov/soc/ (last visited Sept. 30, 2020).

quoted authority omitted). A common method is the "occupational density" method, which "approximates job numbers using a software program known as Job Browser Pro from SkillTRAN, which interprets available data." *Id.* at 1284.

A vocational expert's testimony can be substantial evidence to support a finding even when unaccompanied by supporting data. *Biestek*, 139 S. Ct. at 1155. "And even without significant testing, a factfinder may conclude that testimony has sufficient indicia of reliability to support a conclusion about whether an applicant could find work." *Id.* at 1157. The inquiry is "case-by-case," considering "all features" of the vocational expert's testimony and the rest of the administrative record and deferring to the ALJ "who has seen the hearing up close." *Id.*

For job numbers, a vocational expert need not satisfy Federal Rule of Evidence 702 and *Daubert*, testify with precision, or "formulate opinions with more confidence than imperfect data allows." *Goode*, 966 F.3d at 1283–84. Still, to amount to substantial evidence to support an ALJ's step-five finding that the jobs the claimant can perform exist in significant numbers in the national economy, the vocational expert's testimony must have a "baseline of reliability." *Id.* at 1285.

## Administrative Record

The ALJ conducted the latest of four administrative hearings in January 2018. Tr. 656–727. Eminisor was represented by counsel. Tr. 656. The vocational expert has worked as a vocational consultant since at least 2002. Tr. 1077. His credentials include national certifications as a vocational evaluation specialist and a rehabilitation counselor. Tr. 1077. Eminisor's counsel had no objection to his qualifications to testify as a vocational expert. Tr. 659–60.

Because Eminisor had to show disability by December 31, 2008 (her date last insured), the ALJ and Eminisor's counsel agreed the vocational expert had to testify

about 2008 jobs and job numbers.[2] The ALJ asked the vocational expert whether jobs exist that someone with Eminisor's residual functional capacity, age, education, and work experience could perform. Tr. 667–68. The vocational expert opined someone with those characteristics could work as an assembler, with 18,000 jobs nationally in 2008; a ticket seller, with 43,000 jobs nationally in 2008; and a mailroom clerk, with 26,000 jobs nationally in 2008. Tr. 668–69.

The ALJ and Eminisor's counsel questioned the vocational expert extensively about his opinion on the job numbers. *See generally* Tr. 656–727.

The vocational expert testified that, like most vocational consultants he knows, he uses Job Browser Pro to determine the job numbers. Tr. 672–74. The vocational expert explained Job Browser Pro is "just an electronic" DOT, allowing a user to input a DOT occupation or DOT code and obtain "all the information contained in the DOT." Tr. 673. The vocational expert explained Job Browser Pro incorporates employment numbers from the Occupational Employment Statistics, updated annually in May by the Bureau of Labor Statistics, and, for each year beginning in 2009, Job Browser Pro reports the percentage of the jobs in each Occupational Employment Statistics group

---

[2]Before the hearing, Eminisor's counsel asked the vocational expert to provide the materials on which he would rely for the 2008 job numbers. Tr. 1071–72. The vocational expert responded:

> This letter will provide information requested regarding my reporting of an estimate for the number of jobs available in the United States Economy for an occupational title.
>
> I have researched the United States Department of Labor, Bureau of Labor Statistics Occupational Employment Statistics (OES) archives for the years of 2003 to 2008. Using the Standard Occupational Classification (SOC) code corresponding to a specific Dictionary of Occupational Titles (DOT) code; the information regarding employment numbers was available in the OES Data Table Achieves [sic]. In my opinion as Vocational Rehabilitation professional, this is a reasonable and accepted source of providing a national employment estimate for a DOT number.

Tr. 1075. The vocational expert later clarified he intended to provide only an "overview" in the letter and explained details were difficult to explain in the letter. Tr. 669.

for each DOT occupation.[3] Tr. 673–74, 676, 680–81, 695–96. He provided an example: for the DOT occupation table worker, he used the number of jobs for its Occupational Employment Statistics group (430,450), rounded down (430,000), and multiplied the rounded-down number by the percentage Job Browser Pro reported (5.1 percent) to arrive at the opinion there were roughly 21,500 table-worker jobs. Tr. 674–75.

The vocational expert testified he is unsure exactly how Job Browser Pro determines the percentages, but he believes a "panel" determines them considering the most likely industries with the jobs or possibly other information. Tr. 680–81, 684.

The vocational expert testified that, for his opinion about the 2008 job numbers for the assembler, ticket-seller, and mailroom-clerk occupations, he used the 2008 Occupational Employment Statistics group numbers but the 2009 Job Browser Pro percentages because that was the first year Job Browser Pro became "fancy" and offered the information. Tr. 674, 696, 717–24.

The vocational expert agreed the Occupational Employment Statistics group numbers and the Job Browser Pro percentages can vary from year to year. Tr. 724. The vocational expert explained that because of the annual updates, "few" changes in the group numbers occur from year to year. Tr. 677. The vocational expert explained percentages changed for the ticket-seller occupation from 1.168 in 2009 to 1.236 in 2017 and for the mail-room occupation from 21.83 in 2009 to 20.36 in 2017. Tr. 690, 709; *see also* Tr. 700 (testimony possibly attempting to explain the percentages for

---

[3]The Occupational Employment Statistics is a program through the United States Bureau of Labor Statistics that uses a semi-annual survey to "produce employment and wage estimates for about 800 occupations," and the United States Bureau of Labor Statistics "produces occupational employment and wage estimates for approximately 415 industry classifications at the national level." *Occupational Employment Statistics*, Overview, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/oes/oes_emp.htm# (last visited Sept. 30, 2020).

the assembler occupation were the same as the percentages for the ticket-seller occupation for those years).

The vocational expert agreed the 2008 and 2009 Job Browser Pro percentages likely would have been different for the assembler, ticket-seller, and mailroom-clerk occupations had there been 2008 Job Browser Pro percentages, Tr. 691, but added the differences in percentages would have resulted in differences of only a few hundred jobs ("miniscule," Tr. 722) and emphasized he provides only estimates—conservative ones—and not exactitudes. Tr. 691, 720–21, 724. He elaborated:

> And I think if I would have said these numbers are a precise measurement of 2008, there would be some—you know, I'd have a problem defending that, but when I'm talking about being an estimate and there being—you know, the difference in percentages being a few hundred off and I've already reported an estimate of 18,000 for assembler of small parts in 2008 when, in actuality, the percentage would have been 18,300-and-something. So, you know, I'm already, you know, being conservative with what I've reported as an estimate.

Tr. 720–21. The vocational expert testified the change in job numbers for the mail-room job between 2008 and 2017 is about 2000 jobs. Tr. 725, 726.

In the decision, the ALJ observed the vocational expert testified that an individual with Eminisor's residual functional capacity, age, education, work and experience "would have been able to perform the requirements of the following representative occupations" in these national numbers: small products assembler, DOT 706.684-022 (18,000 jobs); ticket seller, DOT 211.467-030 (43,000 jobs); mail room clerk DOT 209.687-026 (26,000 jobs). Tr. 643. The ALJ rejected Eminisor's challenge to the vocational expert's testimony about those numbers:

> The claimant's representative objected to these job numbers on the ground that the vocational expert's methodology for determining numbers of jobs is not reliable because the software used to determine the number of jobs does not go back further than 2009.

7

> The prior vocational expert Mr. Mitchell testified that the numbers cited in the software program Skill Tran, used numbers from the Occupational Employment Survey (OES). This data is collected on a three-year schedule and adjusted annually. The software went back to 2009. However, he testified that the numbers in 2009 were actually collected in 2008.
>
> The current vocational expert, Mr. Capps testified that the job numbers provided were obtained from Job Browser Pro. This software program pulled information from the DOT as well [as] employment numbers from each occupation from the Department of Labor Bureau of Labor and Statistics, which are an estimate from the Occupation of Employment Statistics.
>
> Mr. Capps testified that when determining job numbers for year[s] prior to the release of Job Browser Pro, he is able to look at the percentage of jobs for a particular group of occupations reported by Job Browser Pro in 2009. For example, he stated Job Browser Pro indicates that for 2009, the job of a table worker was 5.1% of 430,150. He then multiplies that percent by the total number of jobs (rounded off) to come up with the number of jobs available for that year. When asked for clarification by the claimant's representative, the vocational expert confirmed that he did not rely on the actual numbers cited in Job Browser Pro, but rather estimate based on a percentage of the number to account for the different year. The percentage is taken from Job Browser Pro and cannot be manipulated. The vocational expert also noted that even though the percentages may change slightly from year to year, it was a miniscule fluctuation. Given the numbers reported by the vocational expert, the undersigned finds this would not preclude a finding that there were no longer a significant number of jobs.

Tr. 643–44. The ALJ continued,

> The undersigned finds this to be a reasonable explanation. The vocational expert was able to provide a detailed explanation of the methodology he used to determine the number of jobs. The sources used by the vocational expert are industry standard and customarily used in the field of vocational placement. They are also customarily used by other vocational expert peers. The undersigned also noted that there is no standard process that all vocational experts are required to use in determining the number of jobs. Additionally, the number of jobs cited by the vocational expert are for representative occupations. When weighing the vocational expert testimony against the other relevant evidence of the record and prior vocational expert testimony, the

8

> numbers he provided are generally consistent with the numbers for the subsequent year. Additionally, the undersigned notes that counsel is not a vocational expert.

Tr. 644. The ALJ rejected Eminisor's request for a subpoena to the vocational expert to provide the authority on which he relied:

> Counsel for the claimant requested the undersigned issue a subpoena directing the vocational expert to submit copies of the actual authority/evidence/information that he relied upon to provide the number of jobs available. Counsel also asked whether a labor market survey could be used to determine the number of jobs. The vocational expert testified that a labor market survey was dependent on a number of factors such as how large the sample was and who conducted the survey. The undersigned [finds] there is sufficient testimony regarding the methodology and the sources used to make a reliable determination as to the number of jobs.

Tr. 644. The ALJ added,

> 20 C.F.R. 404.1566 provides that vocational experts are allowed to identify jobs based on numerous sources and may take administrative notice of reliable job information available from the DOT, Occupational Outlook Handbook and other reliable publications to determine that jobs exist in significant numbers. The undersigned notes that the agency has specifically stated this is not intended to be an all-inclusive list. However, the undersigned notes that Job Browser Pro is one of three acceptable electronic versions of the DOT hosted by the Social Security Administration. Additionally, the vocational expert testified that the codes used are the DOT numbers, which have not changed since 1972. It is well established that vocational experts recognized expertise provides the necessary foundation for them to testify at hearing and they are not subject to the expert witness standards set forth in the Federal Rules of Evidence.

> Case law regarding prior challenges to the numbers of jobs held that the vocational expert need only state his or her opinion on the number of jobs available in the national economy, noting that vocational experts are not required to explain the methodology utilized by their sources or the methodology used by the vocational expert in analyzing his or her resources.

> The undersigned also overrules to the vocational expert qualifications as a vocational expert. The vocational expert has professional knowledge and over 20 years of experience in job placement. Accordingly, the vocational expert's job information is found to be reliable.

Tr. 644. The ALJ concluded,

> The claimant has received a due process hearing consistent with the applicable law. For the reasons discussed above, the undersigned rejects counsel's objections to the testimony of the vocational expert. The undersigned also denies counsel's request for a subpoena for the vocational expert to provide documents used in testifying to job numbers. This information is already in the record. Additionally, the vocational expert's resume outlines his professional experience, education and work history. His testimony indicated the source of the publications, which formed the basis of the job numbers given and the factors used to form an expert opinion on the numbers of jobs. A subpoena is unnecessary to obtain this information. The vocational expert's credentials were fully review[ed] and as he is a well-qualified vocational expert, the objections are overruled.

Tr. 645.

## Analysis

Eminisor argues the vocational expert's testimony that, in 2008, there were 18,000 assembler jobs, 43,000 ticket-seller jobs, and 26,000 mailroom-clerk jobs is unreliable, and, therefore, the ALJ's step-five finding that the jobs she can perform existed in significant numbers in the national economy is not supported by substantial evidence. Docs. 15, 24.

On this record, Eminisor's argument is unpersuasive. *See Biestek*, 139 S. Ct. at 1157 (explaining the reliability of a vocational expert's testimony must be assessed case-by-case). The date last insured was the last day in 2008. Tr. 151. The vocational expert provided fair estimates of the numbers of the representative jobs existing in 2008 by determining 2008 Occupational Employment Statistics group numbers for those jobs and multiplying those numbers by the 2009 Job Browser Pro percentages. Tr. 674, 681, 696, 717–24. For the percentages, the vocational expert used a source

10

routinely used by vocational consultants—experts in the field—to determine job numbers and reasonably inferred from small changes in percentages from year-to-year after 2009 that the changes in percentages from 2008 to 2009 likewise would have been small. Tr. 673–74, 691, 720, 724. This baseline of reliability suffices. *See Goode*, 966 F.3d at 1284 (explaining a vocational expert need not "formulate opinions with more confidence than imperfect data allows").

This action is unlike other actions requiring remand because of unreliable jobs testimony by vocational experts; in those actions, unlike in this action, the vocational experts provided no explanation for providing current job numbers for prior years. *See, e.g.*, *Hensley v. Colvin*, 89 F. Supp. 3d 1323, 1330–31 (M.D. Fla. 2015) (vocational expert provided 2012 job numbers for between 1990 and 1993 and suggested reducing them by half based on a guess of Florida's population more than two decades earlier); *Belge v. Astrue*, No. 3:09-cv-529-J-JRK, 2010 WL 3824156, at *10 (M.D. Fla. Sept. 27, 2010) (unpublished) (vocational expert provided 2008 job numbers for 1998 and estimated the 2008 job numbers could be reduced by one third as a "fair estimate" for 1998 without further explanation).

Eminisor argues reliance on the vocational expert's expertise is inappropriate because the vocational expert relied not on his professional knowledge but on an "outdated secondary source[] he did not entirely understand." Doc. 15 at 8; *see also* Doc. 24 (reply brief focusing on this argument). This argument is unpersuasive. The vocational expert used his expertise to choose to use Job Browser Pro and to connect the 2009 Job Browser Pro percentages to the 2008 job numbers. Tr. 674, 696, 717–24. The vocational expert's use of Job Browser Pro does not diminish the reliability of his testimony. Even if he did not know exactly how Job Browser Pro determines the percentages, Job Browser Pro is used by most vocational consultants he knows, indicating its reliability as a way to determine job numbers. Tr. 673.

Eminisor observes that although the ALJ testified Job Browser Pro is "customarily used," the software is not administratively noticed. Doc. 15 at 8–9. This

11

observation does not help Eminisor. The SSA takes administrative notice of reliable information from government and other sources and provides only examples of sources of which it will take administrative notice. *See* 20 C.F.R. § 404.1566(d). As the ALJ explained, the sources the vocational expert used are industry standard and customarily used in the field of vocational placement. Tr. 643–44. That Job Browser Pro, a software program that generates information from other sources, is not one of the examples is not dispositive; as examples, they are not exhaustive. *See id.* § 404.1566(d)(1)–(4).

Eminisor complains the ALJ improperly relies on a different vocational expert's testimony from an earlier hearing—Mitchell's testimony—to "quantify" the current vocational expert's accuracy even though the Appeals Council earlier had held the ALJ erred in failing to allow Eminisor's counsel to cross-examine Mitchell, referencing that the ALJ stated a "prior vocational expert had testified that Job Browser Pro's data had been collected in 2008." Doc. 15 at 7, 11. Although the ALJ references Mitchell's testimony in the background, the ALJ relies on the current vocational expert's testimony, which, for the representative jobs, provides similar information about the year used to obtain the Occupational Employment Statistics group numbers (2008). *See* Tr. 643–44, 694–95, 716. To the extent Eminisor refers to the ALJ's statement that, "When weighing the vocational expert testimony against the other relevant evidence of the record and prior vocational expert testimony, the numbers he provided are generally consistent with the numbers for the subsequent year," Tr. 644, the ALJ gave other reasons for crediting the current vocational expert's testimony, including by finding his explanation "reasonable," Tr. 644.

Eminisor emphasizes that the vocational expert testified he could have used other methods to estimate the 2008 job numbers, like a labor-market survey or taking a group of job numbers from years before and after 2008. Doc. 15 at 6–7, 12. But the vocational expert also explained why performing a labor-market survey is unreliable as summarized by the ALJ in the decision. Tr. 644. Regardless, whether another method exists does not mean the method the vocational expert used is unreliable.

12

Remand to reconsider the ALJ's step-five findings on job numbers is unwarranted.

## Conclusion

The Court affirms the Commissioner's decision and directs the clerk to enter judgment for the Commissioner and against Pamela Eminisor and close the file.

**Ordered** in Jacksonville, Florida, on September 30, 2020.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:	Counsel of record